

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

LEROY SIMMONS, JR.,

              Plaintiff,

    v.

CAROLYN W. COLVIN,

              Defendant.

**DECISION & ORDER**
15-CV-6064

## PRELIMINARY STATEMENT

Plaintiff Leroy Simmons brings this action pursuant to Title II and Title XVI of the Social Security Act, seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits. See Complaint (Docket # 1). Presently before the Court are the parties' competing motions for judgment on the pleadings. See Docket ## 8, 13.

## PROCEDURAL HISTORY

On November 8, 2011, plaintiff applied for disability insurance benefits and supplemental security income. Administrative Record ("AR.") at 153-64. The Social Security Administration issued a Notice of Disapproved Claim on April 11, 2012. AR. at 86. Plaintiff then timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). AR. at 96. On January 8, 2013, ALJ Hortensia

Haaverson conducted a hearing on plaintiff's claim. AR. at 36. On March 1, 2013, the ALJ issued a decision, therein determining that plaintiff was not disabled under the Social Security Act. AR. at 14-29. Plaintiff timely filed a request for review of the ALJ's decision by the Appeals Council, submitting additional briefing on April 29, 2013. AR. at 5-10. On December 9, 2014, the Appeals Council declined to review the ALJ's decision, making it the final decision of the Commissioner. AR. at 1—3. This federal lawsuit followed.

## MEDICAL HISTORY

In his application for disability benefits, plaintiff reported that his ability to work was limited by: a herniated disc in his back, arthritis, carpal tunnel syndrome, hypertension, high cholesterol, and acid reflux. AR. at 207. In a pre-hearing memorandum, plaintiff's counsel elaborated that plaintiff was alleging disability based on degenerative changes and spinal stenosis of the lumbar spine, discogenic disease at the C4-5 vertebrae with anterior and posterior osteophyte formation and minimal disc height loss, degenerative change in the left knee, esophageal reflux/GERD, hyperlipidemia, major depressive disorder with psychotic features, diabetes mellitus, retinitis pigmentosa and cataracts in both eyes, and mild tendinopathy of the right Achilles tendon. AR. at 250-51. According to plaintiff, these conditions became disabling on March 31, 2008. AR. at 207.

2

Treatment Record for Physical Impairments: Though plaintiff alleges a disability onset date of March 31, 2008, his pain, and in particular his back pain, can be traced to a work-place fall in the early 1990s. AR. at 51. Much later, on December 4, 2007, plaintiff was referred to Dr. Glenn Rechtine, M.D., by his primary care physician after allegedly suffering a work-related injury in September 2007. AR. at 551-52. Dr. Rechtine discussed with plaintiff physical therapy for his spine. Id. Plaintiff returned to Dr. Rechtine's office on February 12, 2008 for lower back and bilateral leg pain. Id. at 550-51. On February 21, 2008, plaintiff had a magnetic resonance imaging ("MRI") scan taken of his lumbar spine, which revealed degenerative spine disease at the L5-S1 disc. AR. at 724. On March 21, 2008, Dr. Rechtine diagnosed plaintiff with lumbar disc displacement related to a degenerative disc at L5-S1 and remarked that he was not pursuing treatment aggressively enough. AR. At 440, 550. Based on his assessment, Dr. Rechtine determined that plaintiff was capable of performing light-duty work on a full-time basis; could frequently lift ten pounds; could stand and walk with frequent changes in position; and could bend, squat, and do overhead activities occasionally. Id. Plaintiff returned to Dr. Rechtine on May 23, 2008, where he reported a constant pain rated nine out of ten in severity and an inability to sit or stand for more than one hour. AR. at 434. Dr. Rechtine encouraged plaintiff to adopt an exercise

3

regimen and advised him to attend physical therapy.  AR. at 436.

On August 22, 2008, plaintiff saw Dr. Rechtine and complained
of back pain associated with extended sitting, standing, and walking.
AR. at 432.  Plaintiff returned again on October 24, 2008, complaining
of lower back and bilateral leg pain.  AR. at 422.  Plaintiff reported
only being able to walk one mile but presented with a normal gait.
AR. at 423.  Dr. Rechtine advised plaintiff to adopt a fitness plan
and remarked that plaintiff was not consistently working on improving
his aerobic fitness.  AR. at 424.  On January 23, 2009, plaintiff
presented to Dr. Rechtine with unchanged lower back and bilateral
leg pain.  AR. at 416.  According to Dr. Rechtine's notes, plaintiff
had attended physical therapy, had an MRI taken, and began taking
prescription medication with few improvements.     Id.    At the
appointment, plaintiff appeared alert, awake, cooperative, and
oriented.  AR. at 417.  Dr. Rechtine noted that plaintiff needed "to
be much more aggressive with physical therapy," and advised plaintiff
to return in three months.  AR. at 418.  Plaintiff returned on
February 20, 2009 after falling and hurting his left knee.  AR. at
414.  Dr. Rechtine ordered that plaintiff have an x-ray taken, which
showed no acute fracture, no dislocation, and no significant joint
effusion.    AR. at 413.    The x-ray did reveal, however, mucoid
degenerative change in his meniscus, tiny focal signal gap, inferior
prepatellar edema, and mild signal heterogeneity of the cartilage

4

on the patella. AR. at 412. Dr. Rechtine advised plaintiff to begin
aquatic exercise. AR. at 410.

Plaintiff returned to Dr. Rechtine on March 13, 2009, complaining
of continued lower back and bilateral leg pain. AR. at 401.
Plaintiff appeared to suffer from insomnia and high blood pressure.
AR. at 402. According to Dr. Rechtine's report, plaintiff was walking
two and a half miles at a time, several times a day. AR. at 403. Dr.
Rechtine recommended that plaintiff return in a year and that he treat
any pain with rest, heat or ice, and analgesics. Id.

On April 28, 2009, plaintiff's primary care physician referred
him to Dr. John P. Goldblatt, M.D., at the University of Rochester
Medical Center. AR. at 399. Dr. Goldblatt remarked that plaintiff
injured his left knee approximately two years ago while exiting a
bus, and noted that his knee-joint appeared tender on examination.
Id. Dr. Goldblatt also noted that plaintiff's MRI suggested that he
tore his medial meniscus and referred him to physical therapy. Id.

Plaintiff returned to Dr. Rechtine on May 15, 2009, reporting
increased lower back and bilateral leg pain. AR. at 393. Plaintiff
demonstrated lower extremity weakness, and Dr. Rechtine diagnosed
him with a worsening displaced lumbar disc and worsening spinal
stenosis of the lumbar region. Id. Dr. Rechtine opined that
plaintiff was capable of performing light work on a full-time basis
and that he could: lift ten pounds frequently; stand and walk

5

occasionally with frequent position changes; and bend, squat, and do overhead activities occasionally. AR. at 395. Dr. Rechtine also remarked that plaintiff's disability status was temporary. Id.

Plaintiff returned to the University of Rochester Medical Center on December 22, 2009, where Dr. Benedict Digiovanni, M.D., examined him. AR. at 391. Plaintiff complained of left heel and ankle pain that prevented him from walking. Id. Dr. Digiovanni determined that plaintiff had right Achilles tendonitis and left foot plantar fasciitis, and recommended that he stretch and ice the affected areas. Id. Plaintiff returned for a follow-up appointment on March 15, 2010, where he reported mild improvement. AR. at 387. Dr. Digiovanni recommended that he continue stretching and advised him that progress would be slow. Id. On May 28, 2010, Mark Cloninger, a nurse practitioner, reported further improvement to plaintiff's Achilles tendinitis and plantar fasciitis. AR. at 385.

In June 2011, plaintiff sought treatment for vision loss related to retinitis pigmentosa from Dr. Katherine White, O.D. AR. at 679. He reported difficulty seeing due to sun glare, as well as difficulty reading text with his glasses. Id. His treatment notes indicate that he could have been declared legally blind, but resisted so as not to lose his driver's license. AR. at 680.

On July 30, 2012, plaintiff saw Dr. Kadura for lower back pain. AR. at 744. On examination, Dr. Kadura noted that he appeared

6

depressed, and had spasms in his lower back and numbness in his leg.
AR. at 746.   Dr. Kadura recommended that plaintiff continue
stretching, taking warm baths, and using heat pads, and referred
plaintiff to an orthopedic specialist to determine if more invasive
treatment was needed.   Id.   For his depression, Dr. Kadura advised
plaintiff to take antidepressants.   Id.

On December 12, 2012, plaintiff's primary care physician
referred him to Dr. Rajeev Patel, M.D., for worsening back pain.   AR.
at 772.   He said the pain was exacerbated by prolonged sitting and
standing, as well as bending, twisting, and lifting.   Id.   On
examination, patient was able to walk heel-to-toe without difficulty
but demonstrated limited lumbar flexion.   AR. at 772-73.   Dr. Patel
determined that plaintiff likely suffered from discogenic axial low
back pain and referred him to physical therapy.   AR. at 773.   He
prescribed plaintiff anti-inflammatory medication and recommended
that he avoid bending and twisting.   AR. at 773-74.   Plaintiff
returned for a follow-up appointment on December 20, 2012, reporting
continued lower back pain.   AR. at 800.   He demonstrated reduced range
of motion in his lumbar spine, and a December 18, 2012 MRI revealed
segmental degenerative disc desiccation with a broad-based disc bulge
at L5-S1 causing moderate bilateral foraminal stenosis.   Id.   Dr.
Patel recommended that plaintiff continue physical therapy.   Id.

Treatment Record for Mental Impairments: On May 16, 2011,

7

plaintiff saw Dr. Eric Richard, M.D., at the University of Rochester Medical Center for depression-like symptoms. AR. at 259. He reported feeling tired and lonely, having suicidal thoughts, sleeping very little, and having difficulty finding work. Id. Dr. Richard determined that plaintiff suffered from major depression (or type-II bipolar disorder), hypertension, hyperlipidemia, and pre-diabetes, and recommended that plaintiff seek treatment for his depression as soon as possible. Id.

On August 1, 2011, plaintiff saw Dr. Sullafa Kadura, M.D., at the University of Rochester Medical Center for his depression. AR. at 287. Though she did not prescribe him medication, Dr. Kadura referred plaintiff to therapy. AR. at 288. Plaintiff returned to Dr. Kadura on November 14, 2011, complaining of stress, fatigue, and anhedonia. AR. at 290. Dr. Kadura remarked that his depression had not improved and that he was resistant to taking medication. Id. Dr. Kadura also remarked that plaintiff was addicted to nicotine and did "not feel ready to quit" smoking. Id. On January 25, 2012, plaintiff reported continued depression, drug use, and fatigue. AR. at 295. According to treatment notes, plaintiff expressed an interest in taking medication for his depression. Id.

Starting on February 22, 2012, plaintiff began outpatient treatment with Kathleen Crowley, a mental health counselor, at Unity Health Systems. AR. at 556. Plaintiff complained of depressed mood,

8

listlessness, irritability, anxiety, and possible psychosis.  AR. at
557.    According  to  treatment  notes,  the  problems  began  after
plaintiff  was  in  a  car  accident  roughly  ten  years  earlier.   Id.
Crowley recommended that plaintiff attend weekly psychotherapy with
the  possibility  of  hospitalization.   AR.  at  563.   Plaintiff  saw
Crowley  on  March  12,  March  19,  and  March  26,  2012,  and  Crowley
diagnosed  plaintiff  with  recurrent  major  depressive  disorder  of
unspecified severity.  AR. at 607.

        On  May  31,  2012,  plaintiff  sought  inpatient  treatment  for
substance  abuse  at  Syracuse  Behavioral  Health,  but  was  reportedly
denied treatment because "he had too high of a level[] of cocaine
in  his  system."   AR.  at  666-76.   Records  indicate  that  he  was
diagnosed with cocaine, opioid, cannabis, and nicotine dependence,
and  that  his  mental  health  was  suffering.   AR.  at  666.   He  told
practitioners that his mother financially supported him, and that
he enjoyed listening to music, playing the bass and piano, and going
to  concerts.   AR.  at  667.   He  also  reported  recurring  visual  and
auditory hallucinations.  Id.

        On August 10, 2012, plaintiff saw Crowley again.  AR. at 565.
At this appointment, Crowley noted that plaintiff attended six out
of his nine treatment sessions, and that he complied with his therapy.
AR. at 568.  Plaintiff reported that employment was a major goal for
him, but that he continued to struggle with depressed mood, poor sleep,

and low energy. Id. Plaintiff was diagnosed with recurrent unspecified major depressive disorder, rule out psychotic disorder not otherwise specified, and impulse-control disorder not otherwise specified. AR. at 565. Plaintiff returned to Unity Health on August 16, 2012, where Dr. Prakash Reddy, M.D.[1], evaluated his psychiatric health. AR. at 569. He complained of depressed mood, difficulty sleeping, loss of appetite, violent thoughts, and psychosis. Id. He also described weekly hallucinations. AR. at 571. On examination, with the exception of depressed mood, his mental health was unremarkable. Id. Based on his observations, Dr. Reddy also noted a history of alcohol, cocaine, opioid, cannabis, and nicotine dependence. AR. at 571-75.

On November 29, 2012, plaintiff returned to Dr. Kadura for a follow-up appointment. AR. at 750. He reported difficulty sleeping and told practitioners that he was not taking his antidepressants, which Dr. Kadura strongly discouraged. AR. at 750-52.

On December 21 and 24, 2012, Crowley and Dr. Reddy completed a mental residual functional capacity questionnaire for plaintiff. AR. at 737. The report indicated that they had biweekly contact with plaintiff beginning in February 2012, and that he presented

---

[1] Prior to hearing this case the Court disclosed to both counsel that Dr. Reddy is a neighbor of the Court. Aside from an occasional greeting, the Court has no social or other interaction with Dr. Reddy and the parties consented to the Court hearing and determining the competing motions for judgment on the pleadings.

continually with flat affect, depressed mood, and low energy. Id. They diagnosed plaintiff with major depressive disorder, rule out psychotic disorder, rule out schizoid personality disorder, and degenerative eye disease. Id. They also noted that plaintiff had chronic depression with persistent mood disturbances, but declined to comment on his ability to complete work-related activities on a day-to-day basis. AR. at 738-41.

Consultative Physical Examination: On February 29, 2012, Dr. Elizama Montalvo, M.D., provided a physical examination of plaintiff at the request of the Division of Disability Determination. AR. at 590. He complained chiefly of throbbing lower back pain that started in 1994. Id. Extended walking, standing, and sitting exacerbated the pain, which he rated a nine out of ten in severity. Id. Plaintiff also complained of spasms in his left knee, which he said were so painful that they prevented him from sleeping, and pain in his left arm related to a 2003 car accident. Id. He described the arm pain as sharp and said that he was unable to lift with that arm. Id. According to Dr. Montalvo's report, plaintiff had been told that he had high blood pressure and that he was "borderline diabetic." Id. Despite these impairments, plaintiff reported that he cooked twice a week, cleaned occasionally, dressed himself, watched television, and listened to the radio. AR. at 591. He also claimed that he did not shop, did not do laundry, and could not shower himself. Id.

11

Dr. Montalvo noted that plaintiff had poor eyesight – 20/100 in both eyes – and that he complained about pain throughout the examination. Id. He used a cane and was unable to heel-toe walk or squat at all. Id. Dr. Montalvo opined that the cane was necessary for plaintiff to walk. Id. Dr. Montalvo also noted that the range of motion in his cervical spine, lumbar spine, shoulders, and wrists was limited, and that plaintiff was unable to complete the assessment due to his apparent pain. AR. at 592. Based on her examination, Dr. Montalvo diagnosed plaintiff with lower back pain, left knee pain, high blood pressure, depression, left arm pain, and borderline diabetes. Id. In her assessment, plaintiff's prognosis was stable. He would have mild to moderate limitations bending, carrying, kneeling, reaching, walking, standing, and sitting. AR. at 593.

Consultative Psychiatric Examination: On March 19, 2012, Dr. Margery Baittle, Ph.D., conducted a psychiatric evaluation of plaintiff at the request of the Division of Disability Determination. AR. at 595. She remarked that plaintiff had no history of psychiatric hospitalizations and began psychiatric treatment in February 2012. Id. He reported difficulty sleeping and depressed mood, as well as auditory and visual hallucinations. AR. at 595-96. At one point during the examination, he directed unheard voices to be quiet. Id. Plaintiff's mother, who was present at the examination, said that the auditory hallucinations had persisted for a considerable length

12

of time. AR. at 596. In addition, plaintiff reported paranoia, forgetfulness, difficulty concentrating, difficulty planning things, and difficulty learning new things. Id.

On examination, plaintiff was cooperative, but occasionally interrupted the process due to his hallucinations. Id. He walked slowly and with a cane. Id. Though he appeared well-groomed, his thought processes was confused and paranoid and his affect dysphoric. Id. He did not know why he was at the appointment, believing it was a physical examination, and had difficulty concentrating. AR. at 596-97. His memory appeared seriously impaired and his cognitive function, according to Dr. Baittle, had reduced. AR. at 597. He also demonstrated limited insight and poor judgment. Id.

Dr. Baittle noted that plaintiff sometimes cooked, cleaned, and did laundry. Id. He reported no socialization and no contact with his family, other than his mother. Id. He claimed to have no particular hobbies or interests, and reportedly spent his days going to medical appointments, listening to the radio, and watching television. Id. Accordingly, Dr. Baittle opined that plaintiff could follow and understand simple directions and maintain attention and concentration, but that he would have difficulty relating with others and dealing with stress. Id. In short, Dr. Baittle believed that his psychiatric problems might significantly interfere with his ability to function on a daily basis. Id. Specifically, Dr. Baittle

13

diagnosed plaintiff with severe major depressive disorder with psychotic features, paranoid schizophrenia with hallucinatory experiences, and general difficulty moving. AR. at 598. She recommended that he continue with psychiatric treatment and remarked that he had clearly regressed such that he could not look after himself or work at all. Id. His prognosis, she found, was poor. Id.

Non-Examining State Agency Consultation: On April 4, 2012, psychologist L. Meade reviewed plaintiff's medical records and provided a mental residual functional capacity ("RFC") assessment. AR. at 649-53. Dr. Meade determined that plaintiff would not be significantly limited in his ability to remember work-like procedures and simple instructions, but would experience moderate limitations understanding and remembering detailed instructions. AR. at 649. Dr. Meade further opined that plaintiff would be mildly limited in his ability to carry out short instructions and make simple work decisions, and moderately limited: carrying out detailed instructions; maintaining extended attention and concentration; performing activities within a schedule; maintaining attendance and punctuality; maintaining an unsupervised routine; and working with or near others without distraction. Id. Plaintiff would also have moderate limitations interacting with supervisors and coworkers, and mild limitations interacting with the public and maintaining basic standards of cleanliness. AR. at 650. According to Dr. Meade, he

14

would have mild limitations responding to change, and moderate limitations setting realistic goals independently. Id. Based on notes from plaintiff's visits to Unity Health, Dr. Meade determined that plaintiff showed no major problems beyond depression - the hallucinations reported by Dr. Baittle, Dr. Meade found, were unsupported by other treatment notes. AR. At 651. Accordingly, Dr. Meade opined that plaintiff would be able to perform simple work within a year of February 2012, the month he began outpatient treatment at Unity Health Systems. Id.

## HEARING TESTIMONY

Testimony of Plaintiff: On January 8, 2013, plaintiff appeared before ALJ Hortensia Haaversen with his representative, Justin Goldstein. AR. at 36-76. At the time of the hearing, plaintiff was fifty-five years old. AR. at 39. He testified that he was a high school graduate who had attended college for one year in the early 1990s. Id. He testified that he worked at Xerox Corporation in 1998 as a production assembly worker, a forklift operator, and, later, as an expediter. AR. at 42. Around this time, he also worked at Antex of Rochester as a grinder operator. AR. at 43-44. There, he lifted approximately twenty-five to thirty pounds. AR. at 45.

Plaintiff testified that he had lower back pain that started after a fall roughly a decade prior. AR. at 51. The pain extended

15

to his legs and made it difficult for him to sleep. AR. at 52. As a result, he testified, he only slept a few hours per day. Id. He also testified about pain in his left knee, arthritis in his neck, pain in his right Achilles tendon, and loss of use of his left arm. AR. at 53. His pain prevented him from sitting or standing still for extended periods of time, and his lawyer remarked that he stood up at least three times during the hearing. AR. at 50, 54. Further, he testified that he could only walk a few blocks before having to stop and had difficulty lifting anything that weighed more than twenty pounds. AR. at 55.

Plaintiff also testified that he owned, but rarely drove, his own car. AR. at 45. He said that he was unable to drive at night because of his eye impairment. AR. at 46. The impairment also made it difficult for him to read text. AR. at 56-57. Plaintiff explained that he lived alone and that his mother helped him pay rent. AR. at 46. He mentioned that he saw his son frequently, but said that he had no friends and spent his time listening to music. AR. at 47-49.

At the time of the hearing, plaintiff was taking Prozac, medication to reduce his blood pressure and cholesterol, and medication to help him sleep. AR. at 49-50. He also testified that he was hoping to begin physical therapy and still regularly attended therapy sessions with Kathleen Crowley. AR. at 50. Finally, the ALJ asked plaintiff about an automobile accident that occurred in 2001

16

or 2002.  AR. at 59.  Plaintiff was not physically injured but
allegedly developed depression after it.  AR. at 60.  Plaintiff,
however, declined to discuss the accident.  AR. at 60-61.

Testimony of the Vocational Expert: Dr. Randy Salmons, a
vocational expert ("VE"), also testified at the hearing.  AR. at 58.
Dr. Salmons first explained that plaintiff previously worked as an
assembler, expeditor, industrial truck operator, and grinder
operator.  The ALJ then posed a number of hypotheticals to the VE.

First, the ALJ asked Dr. Salmons to explain what employment
opportunities existed for an individual: (1) who was limited to
occasionally lifting twenty pounds and frequently lifting ten pounds;
(2) who was limited to standing or walking about six hours out of
an eight hour workday; (3) who was limited to sitting about six hours
out of an eight hour work day; (4) who had binocular vision, meaning
the position could not involve reading continuous text or driving
at night and required a well-lit environment.  AR. at 61-62.  Dr.
Salmons testified that such an individual could work as an assembler.
AR. at 64.  The ALJ next asked about the same individual from the first
hypothetical, but added that they would be able to follow and
understand simple directions and maintain the attention needed to
perform simple tasks.  Id.  Such an individual, Dr. Salmons
testified, would be able to work as an assembler, a cleaner, an office
helper, a garage cashier, and a gate guard.  AR. at 65.  However, if

17

the individual was unable to keep a regular schedule, make appropriate decisions, and deal appropriately with others, the VE testified that no jobs existed that the individual could perform. AR. at 66-67. Additionally, if the individual had to change positions every ten minutes and take five minute walks every hour, their productivity would decline so greatly that it would result in termination from any position. AR. at 67. If that individual did not need to take five minute walks, however, they could perform the work of a surveillance system monitor or food and beverage clerk. AR. at 68.

## DETERMINING DISABILITY UNDER THE SOCIAL SECURITY ACT

The Evaluation Process:  The Social Security Act provides that a claimant will be deemed to be disabled "if [s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairments must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

18

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving her case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity"

at step five); see also 20 C.F.R. § 404.1560(c)(2).

When evaluating the severity of mental impairment, the reviewing
authority must also apply a "special technique" at the second and
third steps of the five-step analysis. Kohler v. Astrue, 546 F. 3d
260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a). First,
the ALJ must determine whether plaintiff has a "medically determinable
mental impairment." Kohler, 546 F.3d at 265–66; see also 20 C.F.R.
§ 404.1520a(b)(1). If plaintiff has such an impairment, the ALJ must
"rate the degree of functional limitation resulting from the
impairment(s)" in four broad functional areas: "(1) activities of
daily living; (2) social functioning; (3) concentration, persistence,
or pace; and (4) episodes of decompensation." Kohler, 546 F.3d at
266; see also 20 C.F.R. § 404.1520a(c)(3). "[I]f the degree of
limitation in each of the first three areas is rated 'mild' or better,
and no episodes of decompensation are identified, then the reviewing
authority generally will conclude that the claimant's mental
impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d
at 266; see also 20 C.F.R. § 404.1520a(d)(1). If plaintiff's mental
impairment is considered severe, the ALJ "will first compare the
relevant medical findings and the functional limitation ratings to
the criteria of listed mental disorders in order to determine whether
the impairment meets or is equivalent in severity to any listed mental
disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. §

20

404.1520a(d)(2).  If plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266.  If not, the ALJ will then make a finding as to plaintiff's residual functional capacity. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision:  In applying the five-step sequential evaluation, the ALJ first found that plaintiff had not engaged in substantial gainful activity since March 31, 2008, the alleged onset date of his disability.  AR. at 17.  At the second step, the ALJ found that plaintiff had the following severe impairments: degenerative disc disease at L5-S1 with impingement, retinitis pigmentosa, depression starting in February 2012, and polysubstance abuse.  Id. The ALJ noted that plaintiff's neck degenerative disease, left knee degenerative change, gastroesophageal reflux disease ("GERD"), diabetes mellitus, hyperlipidemia, and tendinopathy of the Achilles tendon - though perhaps impairments - did not present the required objective diagnostic evidence to qualify as severe impairments under the regulations.  Id.  At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have a listed impairment which would have rendered him disabled.  AR. at 17-19.  Accordingly, the ALJ moved to the fourth step, which required asking whether plaintiff had the residual functional capacity ("RFC") to perform his past work, notwithstanding his severe impairments.  The ALJ

21

concluded that plaintiff had the RFC to perform light work with the
following limitations:

> he can occasionally lift and carry [twenty] pounds and
> frequently lift and carry [ten] pounds; he can stand or
> walk for about six hours in an eight-hour workday; he can
> sit for about six hours in an eight-hour workday; visually,
> he is able to drive an automobile during the day but not
> night driving; he has good corrected vision in the left
> eye and therefore positions are recommend[ed] that require
> only monocular vision and no reading any continuous text;
> and the work environment should be well-lit in terms of
> light . . . . Only after February 2012 when he started
> treatment for depression [plaintiff] is limited to being
> able to follow and understand simple directions and
> maintain attention accordingly; and he is able to perform
> simple work tasks (Based on the April 3, 2012 assessment
> of State agency psychological consultant L. Meade, Ph.D.
> . . .).

AR. at 19-26. Based on that RFC, the ALJ determined that plaintiff
could perform his past work as an assembly worker. AR. at 26-27.

Despite finding that plaintiff could perform his past relevant
work, the ALJ proceeded to the fifth step, which is comprised of two
parts, to demonstrate that he could perform other jobs existing in
the national economy.   First, the ALJ assessed plaintiff's job
qualifications by considering his physical ability, age, education,
and previous work experience. AR. at 27. The ALJ next determined
whether jobs existed in the national economy that a person having
plaintiff's qualifications and RFC could perform.  Id.; see also 42
U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f).   After
considering all of the evidence, the ALJ found that plaintiff could

perform the work of a housekeeper, office helper, garage cashier, surveillance monitor, and food and beverage clerk. AR. at 27-28.

## STANDARD OF REVIEW

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine *de novo* whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447—48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotations omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's

23

determination. Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal

24

principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## DISCUSSION

Plaintiff raises a number of challenges to the ALJ's decision, including that the ALJ failed to comply with the treating physician rule and that the ALJ's exertional and non-exertional RFC assessments lack support from substantial evidence in the record. See Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings (Docket # 8-1). At oral argument, however, the parties, with participation from the Court, spent substantial time discussing plaintiff's mental impairments and the ALJ's non-exertional RFC finding. The Court was and remains troubled by the ALJ's mental RFC assessment. As highlighted by plaintiff both in his briefing submitted to the Court and at oral argument, the ALJ assigned little weight to the consultative opinion of Dr. Baittle and the joint examining opinion of Crowley (as co-signed by Dr. Reddy) while simultaneously assigning great weight to the opinion of the non-examining State agency psychiatric consultant, Dr. Meade, in formulating her RFC. This resulted in error. The ALJ's non-exertional RFC assessment, which found that plaintiff was capable of completing simple work and only "limited to being able to follow and understand simple directions and maintain attention accordingly," is impermissibly less restrictive than every opinion of record concerning plaintiff's

25

mental impairments. AR. at 20. Accordingly, remand is required.

Under the regulations, while a claimant is responsible for furnishing evidence upon which to base an RFC assessment, the ALJ is also "responsible for developing [the claimant's] complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545, 416.945. This is because "an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." Dailey v. Astrue, 2010 WL 4703599, at *11 (W.D.N.Y. Oct. 26, 2010). After all, "[a]s explicitly stated in the regulations, RFC is a medical assessment; therefore, the ALJ is precluded from making his assessment without some expert medical testimony or other medical evidence to support his decision." Gray v. Chater, 903 F. Supp. 293, 301 (N.D.N.Y. 1995) (citing 20 C.F.R. §§ 404.1513(c) and (d)(3)). Accordingly, while it is true that an "ALJ is not obligated to reconcile explicitly every conflicting shred of medical testimony," the ALJ must explain why a medical opinion was not adopted when his RFC assessment conflicts with that medical source opinion. See Dioguardi v. Comm'r of Soc. Sec., 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) ("The plaintiff here is entitled to know why the ALJ chose to disregard the portions of

26

the medical opinions that were beneficial to her application for benefits." (citations omitted)).   This is especially true where the ALJ purports to assign that medical opinion great evidentiary weight. See Searles v. Astrue, 2010 WL 2998676, at *4 (W.D.N.Y. July 27, 2010) ("An ALJ may not credit some of a doctor's findings while ignoring other significant deficits that the doctor identified." (citation omitted)).

Here, despite the voluminous record, the ALJ fell short of her duty to either rely on competent medical opinion evidence or develop the record such that it contained competent medical opinions as to plaintiff's non-exertional, psychologically-based limitations.   Put simply, there are only three medical opinions of record concerning plaintiff's mental health: Dr. Meade's, Dr. Baittle's, and the joint opinion of Crowley and Dr. Reddy.   The ALJ placed "great weight" on the opinion of Dr. Meade, a State agency psychological consultant who reviewed plaintiff's records without ever examining him in person, but assigned "minimal weight" to the opinion of plaintiff's treating specialists, Crowley and Dr. Reddy, and "little weight" to the opinion of the consultative examiner, Dr. Baittle.   Indeed, at oral argument, counsel for the Commissioner conceded that the ALJ relied solely on Dr. Meade's medical opinion when crafting plaintiff's non-exertional RFC.   While this, in itself, does not necessarily constitute error, see Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993) (noting that

27

the regulations "permit the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record"), it certainly requires more of an explanation than given here. It is problematic that the ALJ assigned "great weight" to Dr. Meade's speculative conclusion that plaintiff would be able to perform simple work within a year of February 2012 and finding that plaintiff did not experience hallucinations, particularly while the record contains multiple notes of auditory and visual hallucinations as well as diagnoses of schizoid and psychotic disorders from plaintiff's examining physicians as late as December 2012. AR. at 737-41.

More troubling, however, is the ALJ's treatment of Dr. Meade's proposed non-exertional limitations. Despite largely disagreeing with the only two opinions of record from examining sources on the severity of plaintiff's mental impairments, Dr. Meade nevertheless found that the record supported a finding that plaintiff would "have difficulty keeping a regular schedule, making appropriate decisions, and dealing with others." AR. at 651. Dr. Meade further opined that plaintiff would be moderately limited in his ability to set realistic goals and working without supervision. AR. at 650-51. Dr. Baittle's opinion corroborates Dr. Meade's findings, stating that plaintiff's mother kept his schedule and opining that he "can probably not learn new things very quickly," "does not make appropriate decisions,"

28

"relates poorly with other," "has much difficulty dealing with stress," and would face significant difficulty functioning daily. AR. at 597. While the Court recognizes that the ALJ declined to incorporate Dr. Baittle's medical source statement into her RFC, I fail to understand why these limitations from Dr. Meade's statement were not incorporated or, at the very least, discussed in her RFC assessment. Indeed, the ALJ assigned Dr. Meade's opinion "great weight" and counsel for the Commissioner confirmed that her mental RFC assessment was based entirely on Dr. Meade's findings, yet the ALJ inexplicably formulated an RFC assessment less restrictive than Dr. Meade's opinion. AR. at 20-25. As noted above, an ALJ must explain why a medical opinion was not adopted when his RFC assessment conflicts with the medical source opinion – especially where, as here, the ALJ gave "great weight" to the opinion undermining her RFC finding. Dioguardi v. Comm'r of Soc. Sec., 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (citations omitted); see also Searles v. Astrue, 2010 WL 2998676, at *4 (W.D.N.Y. July 27, 2010) ("An ALJ may not credit some of a doctor's findings while ignoring other significant deficits that the doctor identified." (citation omitted)). Seeing no explanation for this divergence from Dr. Meade's opinion and finding no other medical opinion that the ALJ could have relied on to form her RFC, the Court has no choice but to remand this matter so that the ALJ may re-evaluate plaintiff's RFC in light of the record as a whole

or develop the record as needed to make a proper RFC assessment.

### CONCLUSION

The Commissioner's motion for judgment on the pleadings (Docket # 13) is **denied**, and plaintiff's motion for judgment on the pleadings (Docket # 8) is **granted** only insofar as remanding this matter back to the Commissioner for further proceedings consistent with the findings made in this Order.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:   September 28, 2016
         Rochester, New York

30